UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NATIONAL LAMPOON INC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 1:13-cv-01094-RLY-TAB |
| | ) |
| TIM DURHAM and | ) |
| DOES 1 through 50 inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| TIM DURHAM | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| NATIONAL LAMPOON INC, | ) |
| | ) |
| Counter Defendants. | ) |
| _____ | ) |
| | ) |
| BRIAN A. BASH, CHAPTER 7 TRUSTEE | ) |
| FOR FAIR FINANCE COMPANY, | ) |
| | ) |
| Intervenor Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| NATIONAL LAMPOON, INC., | ) |
| | ) |
| Intervenor Defendant. | ) |

**ENTRY ON DEFENDANT/COUNTERCLAIMANT TIM DURHAM'S MOTION
FOR SUMMARY JUDGMENT and PLAINTIFF/COUNTER-DEFENDANT
NATIONAL LAMPOON'S MOTION FOR SUMMARY JUDGMENT**

1

On February 28, 2013, Plaintiff, National Lampoon, Inc., filed a five-count Complaint[1] against Tim Durham, its former Chief Executive Officer, and the law firm that represented him in his criminal case, Brown Tompkins Lory & Mastrian,[2] arising out of a $1,000,000 transfer from National Lampoon's business checking account into John Tompkins' law firm account. In its First Amended Complaint, National Lampoon brings claims for: (1) embezzlement, (2) breach of fiduciary duty, (3) conversion, (4) fraudulent conveyance, and (5) unjust enrichment. Durham filed a counterclaim against National Lampoon seeking back-pay and a declaration regarding his stock ownership in, and loans to, National Lampoon.

Durham now moves for summary judgment on all claims alleged in the First Amended Complaint and his two counterclaims. National Lampoon moves for summary judgment on Durham's counterclaims. For the reasons that follow, National Lampoon's motion is **GRANTED** and Durham's motion is **DENIED**.

## I. Judicial Notice

Before addressing the facts relevant to the present motions, the court must first address National Lampoon's request for the court to take judicial notice of public civil court filings and other public records, including forms filed with the Securities and

---

[1] The case was originally filed in the Los Angeles Superior Court. Mr. Tompkins removed the action to the Central District of California on April 30, 2013, and the cause was transferred here on July 8, 2013. On October 30, 2013, National Lampoon filed a First Amended Complaint.

[2] The original Complaint also named Brown Tompkins Lory & Mastrian as a defendant. National Lampoon settled its claim against the law firm and therefore, it is no longer a party to this action.

Exchange Commission ("SEC"). (*See generally* Filing No. 158, National Lampoon's Appendix of Exhibits).

Pursuant to Rule 201(b) of the Federal Rules of Evidence, a court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either: (1) "generally known within the trial court's territorial jurisdiction;" or (2) capable of accurate and ready determination "from sources whose accuracy cannot reasonably be questioned." The documents at issue are public records and documents "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The court will therefore consider National Lampoon's exhibits for purposes of the parties' motions for summary judgment. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (recognizing court may take judicial notice of the contents of court records); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) (recognizing that proceedings in other courts, both inside and outside the federal system, may be judicially noticed); *In re Guidant Corp. v. Sec. Litig.*, 536 F.Supp.2d 913, 921 (S.D. Ind. 2008), *aff'd sub nom. Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009) (recognizing court may take judicial notice of SEC filings at the 12(b)(6) stage); *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002) (recognizing court may take judicial notice of published stock quotes).

## II. Background

Following his criminal indictment for securities fraud in December 2008, Daniel Laikin resigned as CEO of National Lampoon and, on December 18, 2008, Durham replaced him as the new CEO. (Filing No. 158-1, Securities and Exchange Commission

("SEC") Form 8-K; *see also* Filing No. 98, Trustee's Motion to Intervene at 3). Durham alleges National Lampoon's Board of Directors agreed to pay him a base salary of $250,000. National Lampoon disputes this allegation. (SEC Form 8-K) ("Mr. Durham is serving [as CEO] without compensation.").

At the time he was CEO of National Lampoon, Durham owned Fair Finance Company, a financial services business located in Akron, Ohio. *United States v. Durham, et al.*, No. 1:11-cr-42-JMS-DML, Filing No. 217, Superseding Indictment ¶¶ 1-2. On February 8, 2010, creditor-investors filed an involuntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Ohio against Fair Finance[3] following an FBI raid on its Akron, Ohio offices and on the Indianapolis offices of Durham's other company, Obsidian Enterprises, Inc. (*See* Filing No. 158-7, Trustee's Memorandum in Support of Motion to Approve Compromise with National Lampoon, Inc. ("Trustee's Motion to Approve") ¶ 9; Filing No. 98, Trustee's Motion to Intervene at 1-2)). The Trustee of that bankruptcy, Brian Bash, has since intervened in this case. (Filing No. 103, Order granting Motion to Intervene).

On March 14, 2011, Durham was indicted and arrested for securities fraud, wire fraud, and conspiring to commit fraud for essentially engaging in a Ponzi scheme at the expense of Fair Finance investors. (Filing No. 9, Superseding Indictment; *see also* Filing No. 158-6, Trustee's Complaint to Avoid Fraudulent Transfers Against National Lampoon ¶ 2). Durham's criminal defense attorney at the time was Mr. Tompkins.

---

[3] *In re Fair Finance Co.*, No. 10-50494 (Bankr. N.D. Ohio).

(Filing No. 73, Compl. ¶ 13). From April 2011 through January 2012, Durham was under house arrest at his home in Indiana. (Filing No. 77, Answer ¶ 12).

On June 13, 2011, the Trustee filed an adversary proceeding against National Lampoon in the Central District of California to recover over $9,000,000 in fraudulent transfers allegedly made to National Lampoon[4] through Durham's and Laikin's loans and investments. (Filing No. 158-6, Trustee's Complaint to Avoid Fraudulent Transfers). In the Trustee's litigation against National Lampoon, the Trustee alleged that the purported loans and investments from Durham had historically been the principal source of funds used for operations and working capital at National Lampoon. (*Id.* ¶ 45). Therefore, the Trustee sought to recover any and all money Durham ever loaned[5] or invested in National Lampoon. (*Id.* ¶¶ 55, 65, 77).

In the midst of all this, on July 21, 2011, National Lampoon and Warner Brothers entered into a Settlement Agreement and Release that, among other things, resolved a dispute between the parties concerning Warner's distribution of the National Lampoon Vacation motion pictures and Warner's accounting methods, calculations, and allocations, and provided National Lampoon with an advance in the amount of $2,705,448, recoupable from National Lampoon's share of the Vacation motion pictures.

---

[4] *Bash v. National Lampoon, Inc.*, No. 11-CV-04999 (C.D. Ca.).
[5] As of October 31, 2008, and documented in the Form 10-Q Quarterly Report, the only loans outstanding and owing to Durham totaled $897,059 in principal and $35,479 in interest. The obligations were unsecured and payable on demand. During the three months ending October 31, 2008, National Lampoon made payments of $33,200.00 to Durham. National Lampoon also reported that Durham made no further commitment to provide loans to National Lampoon. (Filing No. 164-9, Form 10-Q at 9, 22).

5

The Settlement Agreement was signed by Durham purportedly on behalf of National Lampoon. (Filing No. 161-1, Affidavit of Cora Victoriano ¶ 6).

On July 28, 2011, immediately after the settlement money from Warner Brothers was deposited into National Lampoon's business checking account, Durham instructed Comerica Bank to transfer $1,000,000 out of National Lampoon's business checking account (account number 1894202959) into Mr. Tompkins' law firm account (account number 8003157). The wire transfer was not authorized in accordance with National Lampoon's corporate bylaws. (*Id.* ¶ 7). Durham claims National Lampoon authorized him to take $545,000 as partial payment of his accrued and unpaid salary. (*See* Filing No. 160-3, 2011 Form 1099-MISC).

In January 2012, Durham resigned as CEO of National Lampoon. (Answer ¶ 22).

On June 20, 2012, Durham was found guilty on all counts in his criminal trial. (*United States v. Durham, et al.*, No. 1:11-cr-42-JMS-DML, Filing No. 354, Jury Verdict). He was sentenced to fifty (50) years in prison and ordered to pay $208,830,082.27 in restitution to the investment certificate holders of Fair Finance, and to cooperate with the Trustee. (*Id.*, Filing No. 456, Amended Judgment).

Since Durham's incarceration, the Trustee has obtained judgments aggregating in excess of $136,000,000 against Durham in other actions (other than an action brought by Thomas McKibben[6], *et al.*) in the Northern District of Ohio, including, on June 4, 2012, a judgment in the amount of $152,452.75; on May 28, 2013, a judgment in the

---

[6] Documents in evidence refer to this case as the "McKibben Litigation."

amount of $134,837,533.14; and on November 22, 2013, a judgment in the amount of $1,151,953.39, plus post-petition interest on all judgments. (Filing No. 158-3, Trustee's Motion to Approve Assignment Agreement and Compromise of Claims Against Timothy Durham at 3).

On September 7, 2014, Durham fully executed an Assignment Agreement and compromise of claims with the Chapter 7 Trustee, which transferred and conveyed virtually all of Durham's assets to the Trustee. (Filing No. 158-4, Notice of Execution of Assignment Agreement). However, with respect to the pending action, the Assignment states:

> [A]ssignor shall continue to litigate that action and defend the claims against him and assert his claims, cross-claims and counterclaims and shall retain ownership of such claims, cross claims and counterclaims subject to Assignor's current and continuing assignment of any and all proceeds of claims asserted in the National Lampoon Litigation to the Trustee, including any and all receivables due Assignor from National Lampoon, any salary due and any and all capital stock of National Lampoon . . . .

(Filing No. 158-3, Ex. 3, Assignment Agreement ¶ 1(J)). The Bankruptcy Court approved the settlement and assignment agreement on December 17, 2014. (Filing No. 158-5, Order Approving Trustee's Motion to Compromise with Timothy Durham).

On July 2, 2015, the adversary proceeding between the Trustee and National Lampoon settled for $3,000,000. (Filing No. 158-8, Order Approving Compromise of Claims by Trustee Against National Lampoon).

Lastly, on June 17, 2016, National Lampoon sought the Delaware Court of Chancery's intervention to resolve how much stock each National Lampoon stockholder currently owns. (*In re National Lampoon, Inc.*, Case No. 12475-VCG). The court issued

7

a Revised Final Order on February 21, 2017, wherein it resolved that issue. (Filing No. 169-16, Revised Final Order). With respect to Durham's shares, the Shareholder Report includes a notation stating that "[a]ll National Lampoon stock owned by Timothy Durham has been transferred to Brian A. Bash as Chapter 7 Trustee for Fair Finance Company . . . ." (Filing No. 167, Shareholder Report).

### III. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On cross-motions for summary judgment, the court's review of the evidence requires it to "construe all inferences in favor of the party against whom the motion under consideration is made." *Williams v. Aetna Life Ins. Co*., 509 F.3d 317, 321 (7th Cir. 2007) (internal quotation marks and citations omitted).

### IV. Discussion

Durham moves for summary judgment on Counts I-V of the Amended Complaint. The court begins with Count I of the Amended Complaint for embezzlement.

#### A. Count I

In Count I, National Lampoon alleges Durham embezzled $1,000,000 from its business checking account. Civil embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it

8

has lawfully come." *In re Weber,* 892 F.2d 534, 538 (7th Cir. 1989) (internal quotation omitted). The civil tort of embezzlement primarily arises in the bankruptcy context. *See, e.g., In re Jacobs*, 448 B.R. 453, 477 (Bankr. N.D. Ill. 2011); *In re Fowers*, 360 B.R. 888, 898 (N.D. Ind. 2007). To establish a claim for embezzlement, a creditor must prove that: (1) the defendant (or debtor) appropriated the plaintiff's (or creditor's) property for the defendant's own benefit; and (2) the defendant/debtor acted with fraudulent intent or deceit. *In re Jacobs*, 448 B.R. at 477; *In re Fowers*, 360 B.R. at 898.

Rather than argue the merits with citation to legal authority, Durham states that embezzlement connotes "secretive or clandestine actions." His actions, he argues, were not secretive nor clandestine because the alleged embezzlement occurred while he was CEO. Durham's response is puzzling. Indeed, it was his position as CEO which gave him the ability to control National Lampoon's settlement proceeds and to authorize the disbursal of $1,000,000 into Mr. Tompkins' law firm account. In the absence of any evidence in support of his motion for summary judgment on Count I, his motion is **DENIED**.

### B. Counts II-V

The balance of the claims alleged in the Amended Complaint—breach of fiduciary duty (Count II), conversion (Count III), fraudulent conveyance (Count IV), and unjust enrichment (Count V)—arise from the $1,000,000 transfer. In his memorandum, Durham correctly argues Counts II-V "are all derived from the same alleged embezzlement on July 28, 2011." As that assertion is the basis of his entire argument, Durham's motion for summary judgment on Counts II-V is **DENIED**.

### C. Durham's Counterclaims

The parties cross-move for summary judgment on Durham's counterclaims. The court begins with Durham's claim for unpaid wages.

#### 1. Unpaid Wages

Durham alleges his salary for serving as CEO of National Lampoon was $250,000, and that, after the deduction of $545,000, he is owed $246,667. In support of his counterclaim, he relies on two documents. The first of these is the 2011 National Lampoon Form 1099-MISC (miscellaneous income) issued for $545,000, which names him as the recipient. He argues this form was filed with the Internal Revenue Service to account for his accrued and unpaid salary. The second is an unauthenticated e-mail chain between Durham and National Lampoon Secretary Cora Victoriano. (Filing No. 162-2, Email between Durham, Victoriano, and others). National Lampoon counters with a 2008 Form 8-K filed by National Lampoon with the SEC which explicitly states, "Mr. Durham is serving [as CEO] without compensation." (Filing No. 158-1, SEC Form 8-K). Notwithstanding the unauthenticated e-mail chain, the court finds the 1099-MISC raises a material issue of fact as to whether Durham was paid, or was meant to be paid, for his services. National Lampoon's motion for summary judgment on this counterclaim is **DENIED**, and Durham's motion for summary judgment is **DENIED**.

#### 2. Declaratory Judgment Claims

Durham's declaratory judgment claims are for reimbursement of loans and a declaration awarding him 35%-40% of National Lampoon's common stock. National Lampoon first argues his claims are barred by the doctrine of res judicata or collateral

estoppel due to the final judgments in the Trustee's adversary proceedings against National Lampoon and Durham.

### a. Res Judicata/Collateral Estoppel

Indiana recognizes two doctrines which bar litigation in a subsequent case: (1) res judicata (or claim preclusion), and (2) collateral estoppel (or issue preclusion). Res judicata, also known as claim preclusion, is an equitable doctrine that "bars claims that were litigated or could have been litigated in a previous proceeding." *Arrigo v. Link*, 836 F.3d 787, 798-99 (7th Cir. 2016). Indiana courts apply res judicata only if four elements are satisfied: (1) the former judgment was rendered by a court of competent jurisdiction; (2) the matter now in issue was, or could have been, determined in the prior action; (3) the controversy adjudicated in the former suit was between the parties to the present suit; and (4) the judgment in the former suit was rendered on the merits. *Small v. Centocor, Inc.*, 731 N.E.2d 22, 26 (Ind. Ct. App. 2000). Collateral estoppel "bars subsequent relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit." *Id*. at 23 (citing *Slutsky v. Crews,* 713 N.E.2d 288, 291 (Ind. Ct. App. 1999)). To invoke the doctrine, the party seeking estoppel must establish that: (1) there has been a final judgment on the merits in a prior action; (2) the issues are identical; and (3) the party to be estopped was a party or in privity with a party in the prior action. *Id.* at 28 (citing *Adams v. Marion County Office of Family and Children,* 659 N.E.2d 202, 205 (Ind. Ct. App. 1995)).

11

Here, res judicata does not apply because the third element—the prior suit was between the same parties as the present suit—is not satisfied. Although the Trustee's claims against National Lampoon and Durham are part of the Fair Finance bankruptcy, the underlying adversary actions were not between National Lampoon and Durham; they were between the Trustee and National Lampoon, and the Trustee and Durham.

As for collateral estoppel, National Lampoon relies on the Trustee's Motion to Approve Assignment Agreement and Compromise of Claims Against Timothy Durham in the McKibben Litigation. There, Durham agreed to assign substantially all of his assets to the Trustee in settlement of that litigation. Collateral estoppel does not apply because the second element—identical issues—is not satisfied. The McKibben Litigation, as far as the court is aware, did not address the issue of Durham's fraudulent loans and stock purchases, at the expense of Fair Finance investors, to National Lampoon.

### b. Equitable Estoppel

Next, National Lampoon argues Durham's claims are barred by equitable estoppel. The elements of equitable estopped are: (1) a representation or concealment of a material fact, (2) made by a person with knowledge of the fact and with the intention that the other party act upon it, (3) to a party ignorant of the fact, (4) which induces the other party to rely upon it to his detriment. *Clark v. Crowe*, 788 N.E. 2d 835, 840 (Ind. Ct. App. 2002). In the Trustee's adversary proceeding against National Lampoon, he alleged that National Lampoon obtained the money from Laikin and Durham with knowledge that the money was obtained through fraud. Indeed, the Complaint alleged, "National Lampoon took the

12

Transfers with actual or constructive knowledge that the Transfers were made with funds from Fair, [and] that the funds were obtained by defrauding Fair's Investors." (Complaint to Avoid Fraudulent Transfers ¶ 57; *see also id.* ¶ 45 ("National Lampoon admits that "[h]istorically, our principal sources of funds used for operations and working capital have been revenues and loans received from Daniel S. Laikin, . . . and Timothy Durham.")). National Lampoon denies these allegations. (*See* Filing No. 158-13, Answer to Trustee's Complaint ¶¶ 45, 56). However, since the adversary proceeding settled, the issue of National Lampoon's knowledge remains unresolved. Therefore, equitable estoppel does not apply.

### c. Judicial Estoppel

National Lampoon also argues Durham's counterclaims are barred by judicial estoppel due to statements made in his criminal trial that he was not owed any money by National Lampoon. National Lampoon, however, provides no evidence to substantiate its argument. Instead, it relies on Durham's Application to Proceed Without Prepaying Fees or Costs on Appeal and the court's Order granting the same. (Filing No. 158-10, Application; Filing No. 158-11, Order). All this proves is that Durham did not have the money to pay docket fees of his appeal or post a bond for them. Significantly, Durham's Application does not definitely address the issue of whether he is owed money from National Lampoon. Therefore, judicial estoppel does not apply.

### d. Court of Chancery Decision

National Lampoon's best argument involves the Court of Chancery's Revised Final Order regarding the stock ownership of National Lampoon investors. The Order

13

specifies Durham's stock ownership and explicitly provides that those shares have been assigned to the Trustee. Therefore, Durham's counterclaim is barred under either res judicata or the simple fact that no "case or controversy" exists on his counterclaim. *See* 28 U.S.C. § 2201 (noting the court may declare the rights and other legal relations of interested parties "[i]n a case of actual controversy within its jurisdiction"). National Lampoon's motion for summary judgment on this counterclaim is **GRANTED** and Durham's motion is **DENIED**.

### e. Loans

The last issue regards the merits of Durham's declaratory judgment regarding his loans and advances to National Lampoon. In his Counterclaim, he alleges these total approximately $4,000,000, exclusive of costs and interest. (Filing No. 77, Counterclaim ¶ 18). But in his Response to National Lampoon's motion, he posits the amount totals $8,440,108.06 through December 14, 2009. (Filing No. 162, Response at 6). Curiously, he cites the Trustee's Complaint to Avoid Fraudulent Transfers in the Trustee's adversary proceeding against National Lampoon[7] as evidence. (*See id.* ("Trustee Bash alleged [in the National Lampoon adversary] that Durham and companies controlled by him made loans and advances to National Lampoon in excess of $9,000,000.")). As noted previously, the Trustee's adversary proceeding against National Lampoon addressed the issue of the fraudulent loans and advances Durham made to National Lampoon, and that

---

[7] As a side note, Trustee's Complaint makes no mention of $8,440,108.06; rather, it seeks to avoid and recover $9,114,523.69 from National Lampoon. (*See* Trustee's Complaint to Avoid Transfers ¶ 77).

14

proceeding was settled for $3,000,000.  Importantly, there is no evidence in the record to substantiate Durham's claim to *additional* money from *legitimate* loans and advances to National Lampoon.  Furthermore, if, by citing the Trustee's adversary proceeding against National Lampoon, Durham is admitting the loans and advances he made were fraudulent, he is not entitled to that money in any event.  Therefore, his motion for summary judgment on this counterclaim is **DENIED** and National Lampoon's is **GRANTED**.

V.      **Conclusion**

For the reasons set forth above, National Lampoon's Motion for Summary Judgment on Durham's Counterclaims (Filing No. 156) is **GRANTED in part and DENIED in part**.  Specifically, the motion is **GRANTED** with respect to Durham's counterclaim for reimbursement of loans and advances he made to National Lampoon, and is **GRANTED** with respect to his request for a declaration of his stock ownership in National Lampoon.  Its motion is **DENIED** with respect to Durham's claim for unpaid wages.  In addition, Durham's Motion for Summary Judgment (Filing No. 159) is **DENIED**.

**SO ORDERED** this 10th day of July 2017.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

15